UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michelle Halberg,                                    File No. 20-cv-1518 (ECT/JFD)

        Plaintiff,

v.                                                                **OPINION AND ORDER**

Location Services, LLC,

        Defendant.

---

Michelle Gibbons, Christopher D. Jozwiak, and Jerri C. Adams, Baillon Thome Jozwiak & Wanta LLP, Minneapolis, MN, for Plaintiff Michelle Halberg.

Dawn L. Gagne and Patrick H. Elliott, Elliot Law Offices, P.A., Minneapolis, MN, and Matthew S. Effland, Effland Legal Consulting, LLC, Indianapolis, IN, for Defendant Location Services, LLC.

---

Plaintiff Michelle Halberg alleges that her former employer, Defendant Location Services, violated the Family and Medical Leave Act ("FMLA") when it assigned her new job duties after she returned from FMLA leave, and then again when it terminated her employment. Halberg also alleges that her termination violated the anti-discrimination and anti-reprisal provisions of the Minnesota Human Rights Act ("MHRA"). Location Services has moved for summary judgment. The motion will be granted. Halberg's FMLA entitlement claim fails because as a matter of law the new job duties Halberg has identified were not materially different from the position's pre-leave duties. Halberg's FMLA discrimination claim does not survive because Halberg has not identified evidence from which a juror reasonably could infer a causal connection between her exercise of FMLA

rights and her termination.  Halberg's MHRA discrimination claim fails primarily because Halberg has not identified record evidence from which a reasonable juror could find that she suffered from a disability.  Finally, Halberg's MHRA reprisal claim is not trial-worthy because it is not pleaded in the Complaint and because on this record no reasonable juror could find a causal connection between protected activity and Halberg's termination.

I[1]

*Halberg began working at Auto Approve, a vehicle refinancing company in Maple Grove, Minnesota, as an accounting clerk in July 2018.*  Gagne Decl. [ECF No. 36] Ex. 1 [ECF No. 36-1] at 3.  Her duties included billing and accounts-receivable functions, data entry into accounting or billing systems, and other duties as assigned.  Gagne Decl. Ex. 9 at 29–30.  When Halberg began working for Auto Approve, her supervisor was Chuck Pentilla, Auto Approve's controller.  Kevin Marciniak was the human resources manager. Gagne Decl. Ex. 1 at 8; Marciniak Dep. [ECF No. 46-1] at 46.

*In October 2018, Defendant Location Services acquired Auto Approve.*  Marciniak Dep. at 34.  Around that same time, Location Services acquired several other automotive-related businesses in Minnesota (and other states).[2]  As relevant here, the acquired

---

[1]   Unless otherwise noted, the facts are undisputed or are described in a light most favorable to Halberg.  Fed. R. Civ. P. 56(a).

[2]   The summary-judgment record includes no concise, informative description of Location Services.  In its opening brief, Location Services describes itself as "a national company that acquired the assets of several companies effective October 31, 2018."  Def.'s Mem. in Supp. [ECF No. 34] at 4.  Regardless, based on the nature of the businesses the record shows it acquired, it seems safe to describe Location Services as a business that provides an array of automobile-related services.

businesses included a company called Repossessors, Inc., and other automobile-related businesses, including repossession and towing businesses.  Cline Decl. [ECF No. 37] ¶ 2; *see* Robideaux Dep. [Ex. 46-2] at 22–23, 32.

*Effective January 1, 2019, Halberg became a Location Services employee.*  After closing these transactions, employees of the acquired businesses became employees of Location Services effective January 1, 2019.  Marciniak Dep. at 36–37; Halberg Dep. [ECF No. 46] at 81.  Halberg began working for Location Services on that date in the same role she had with Auto Approve.  Halberg Dep. at 55, 81, 84.  Though she became a Location Services employee, Halberg continued to support only Auto Approve's business line and "never did anything for anybody else."  *Id.* at 55–57.  Other aspects of Halberg's employment changed.  As a result of the acquisition, Auto Approve moved offices from Maple Grove to Brooklyn Center, where Auto Approve shared space with Repossessors, Inc.  *Id.* at 56–57.  After this move, Halberg began working with a new co-worker, Michelle Wallace, and Halberg's supervisor changed as well.  *Id.* at 58–59.  In July 2019, Pentilla left Location Services, and Marciniak (who had stayed on as Location Services' human resources manager) temporarily became Halberg's supervisor.  *Id.* at 79; Marciniak Dep. at 24–25, 35.  Then, in October 2019, Mark Robideaux, the Midwest Regional Accounting Controller, was assigned as Halberg's supervisor.  Halberg Dep. at 58–59; 79–80; Jozwiak Decl. [ECF No. 42] Exs. AC [ECF No. 42-29] at 3–4 and AF [ECF No. 42-32] at 2.

*A herniated disc forced Halberg to undergo surgery and take FMLA leave.*  During the early summer of 2019, Halberg began seeing a doctor about pain in her neck.  Halberg Dep. at 177.  Halberg ultimately was diagnosed with a herniated disc, and her doctor

determined that she would need cervical fusion surgery.  *See id.* at 174–78.  Halberg informed Marciniak that she would need to take medical leave, and Marciniak provided Halberg with FMLA paperwork to complete with Principal Absence Management, a third party that administered employee leave for Location Services.  Marciniak Dep. at 59–61; Halberg Dep. at 78–79.  Halberg also informed Robideaux about her upcoming FMLA leave.  Halberg Dep. at 76–77; Robideaux Dep. at 66, 67; Marciniak Dep. at 63.  Principal approved Halberg's FMLA leave request from October 23 to December 4, 2019.  Jozwiak Decl. Ex. T [ECF No. 42-20]; Marciniak Dep. at 78.   Robideaux and Marciniak raised no concerns about Halberg's leave, and according to Halberg, Robideaux was "very understanding, and he seemed very positive about it."  *See* Compl. [ECF No. 1-1] ¶ 10; Halberg Dep. at 77, 92–93, 107; *see also* Robideaux Dep. at 66 ("I agreed that she should get whatever procedure done she needed to get done").  At Robideaux's direction, Rachelle Haas, who had been performing accounting work for Minnesota Repossessors, Inc., and other acquired entities prior to Halberg's leave, was assigned to support Auto Approve in Halberg's absence.  Robideaux Dep. at 68, 105–106; Marciniak Dep. at 65–68.  In addition to Haas, Michelle Wallace would share responsibility for Halberg's work in her absence. Marciniak Dep. at 92–93; Robideaux Dep. at 83–84, 103–105; Haas Dep. [ECF No. 46-5] at 51.  Halberg had surgery on October 23, 2019.  Compl. ¶ 11.

*Halberg attempted returning to work part-time, but ongoing pain forced her to take additional FMLA leave.*  On November 25, 2019, Halberg returned to work part-time, resuming her regular accounting duties for Auto Approve.  Halberg Dep. at 72, 91–92; Marciniak Dep. at 85–90.  Apart from her request to work part-time, which Location

Services approved, Halberg sought no other accommodations. Halberg Dep. at 146. Very soon after returning, however, Halberg was experiencing too much pain to work. Marciniak suggested Halberg follow up with her doctor to confirm that nothing was wrong and that she was capable of returning to work. Marciniak Dep. at 89–90. After seeing her doctor, Halberg informed Marciniak that she would need to take additional FMLA leave. Halberg Dep. at 93. Principal approved Halberg's leave through January 14, 2020, exhausting the twelve weeks of leave to which she was entitled under the FMLA.[3] Jozwiak Decl. Ex. AB. During this additional leave, Halberg informed Marciniak that she would not require accommodations when she returned to work. Halberg Dep. at 184. Robideaux was also informed that Halberg would not require accommodations for her return to work. *Id*.

*As planned, Halberg returned to work full-time on January 17, 2020, without restrictions or accommodations.* Jozwiak Decl. Ex. AD [ECF No. 42-30]; Marciniak Dep. at 116–17; Halberg Dep. 72. Halberg's job title, job description, pay, benefits, work location, hours, and supervisor remained unchanged from before her leave. *See* Halberg Dep. at 123–127. Halberg resumed her Auto Approve accounting duties for a day or two.

---

[3]     Because she had exhausted her allowed FMLA leave effective January 14, Halberg's request to take FMLA leave on January 15 and 16 was denied. Jozwiak Decl. Ex. AB. Principal reviewed whether Halberg might be granted leave on those two dates "as a possible reasonable accommodation under the Americans with Disabilities Act (ADA)." *Id.* Ex. I. At the hearing on this motion, Halberg and Location Services seemed to agree that Principal granted Halberg ADA leave on these two dates. Halberg also asserts this fact in her brief. Pl.'s Mem. in Opp'n [ECF No. 41] at 36 ("Principal processed those dates [*i.e.*, January 15 and 16, 2020] as ADA accommodations, which Defendant received notice of on January 23."). But there is no record evidence showing whether Principal ever approved Halberg's leave request with respect to these dates on this ADA basis.

Halberg Dep. at 124–125.  However, Halberg had an approved vacation scheduled from January 24 through February 3, 2020.  Halberg Dep. at 96, 173; Robideaux Dep. at 121. In view of this imminent vacation, Robideaux assigned Halberg a project for Repossessors, Inc., with the plan that Halberg would resume her pre-leave duties for Auto Approve after returning from her vacation.  Robideaux Dep. at 121–22; Halberg Dep. at 120, 121–122, 124–25.  Haas would continue covering Halberg's Auto Approve work during this one-week period.  Robideaux Dep. at 121–22.  Prior to this assignment, Halberg had not worked on any Repossessors, Inc. projects or in the repossession industry before, and she was generally unfamiliar with the software used by Repossessors, Inc.  Halberg Dep. at 117–118; Robideaux Dep. at 123, 58–60.  Halberg also did not initially have the computer access necessary to work on this project, so she filled her time with Auto Approve work at first.  Halberg Dep. at 122–125.

*Location Services terminated Halberg's employment prior to her scheduled vacation, on either January 23 or January 24, 2020*.[4]  Location Services says that Halberg's termination was part of a company-wide reduction in force intended to streamline and consolidate functions among Location Services and the acquired businesses.  Gagne Decl. Ex. 8 at 28.  This reduction in force began after the Location Services acquisitions and continued through 2021.  Cline Decl. ¶ 2; *see also* Robideaux

---

[4]    Though it doesn't make a difference, the record is not clear about the precise date of Halberg's termination.  Halberg testified that Location Services terminated her employment during a meeting on January 23, 2020.  Halberg Dep. at 142–44.  But a "Separation of Employment" letter dated January 24, 2020, says that Halberg's "last working day will be Friday, January 24, 2020."  Gagne Decl. Ex. 8 at 28.

Dep. at 125.  Relevant here, at the time of Halberg's leave, up to eight employees worked in Location Service's finance/accounting area and reported to Robideaux.  Robideaux Dep. at 27–28.  Except for Halberg, each of these employees provided services to more than one Location Services business.  *Id.* at 27–33, 157.  In January 2020, Locations Services' Chief Financial Officer Mark Pohlman directed Robideaux to eliminate a role in the Minneapolis finance and accounting area.  *Id.* at 126–131.  Pohlman told Robideaux that the elimination was needed because the company was losing money.  *Id.* at 130–131.  By that time, similar departments in other regions had been downsized.  *Id.* at 131.  Robideaux wanted to retain "an individual that could wear the most hats for various companies involved approaching year-end and consolidating […] for the acquisition of Location Services."  *Id.* at 134.  After looking at the department as a whole and evaluating its accounting staff, Robideaux decided to eliminate Halberg's role. Her absence, he decided, would have the least impact because Halberg lacked flexibility in, and general knowledge of, the overall accounting department.  *Id.* at 132–34.  At that time, Halberg's only experience outside Auto Approve was the four days she had been assigned the Repossessors, Inc. project (after she returned from leave).  *Id.* at 157–158.  Robideaux determined that Halberg

> had no knowledge on the other side of the business, the acquisition side that Location [Services] had for all the other entities.  She had strictly been working in Auto Approve and did not have … the knowledge in how to perform the tasks in the various other businesses that were not Auto Approve.

*Id.* at 157.

*Ultimately, between early 2019, and early 2021, 231 employees were terminated as part of Location Services' ongoing reduction in force.*  Cline Decl. ¶ 3.  Of these positions,

24 were in accounting and finance, and 45 were eliminated in Minnesota.  *Id.*  As of September 2021, over 130 positions had been furloughed due to lack of work.  *Id.*  Robideaux was furloughed in December 2020.  Robideaux Dep. at 23.  Marciniak was terminated as part of a reduction in force soon after plaintiff.  Marciniak Dep. at 139–140, 150.  Of the employees in the Minneapolis accounting/finance department when Halberg was discharged in 2020, two remain—Michelle Wallace and Rachelle Haas—and they have absorbed the work that was done by others.  Cline Decl. at ¶ 4.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

## A

### 1

Halberg alleges that Location Services engaged in acts prohibited by the FMLA, and 29 U.S.C. § 2615(a) provides the basis for her claims.[5]  It reads:

---

[5]     In her Complaint, Halberg alleges that her FMLA claims arise under "29 U.S.C. § 2615(b)(1)."  Compl. ¶ 24.  It seems safe to conclude that this citation was just a mistake

**(a) Interference with rights**

**(1) Exercise of rights**

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

**(2) Discrimination**

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Our Eighth Circuit Court of Appeals "has recognized three types of claims arising under these two subsections. The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.* Though in several older cases the Eighth Circuit has described this claim as one for "interference" with FMLA rights, *e.g.*, *Stallings*

---

and that Halberg intends to bring her FMLA claims under § 2615(a). Section 2615(b)(1) makes it "unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter[.]" The Complaint's allegations do not support a § 2615(b)(1) claim. Halberg identifies no relevant "charge" or "proceeding," a necessary element of a § 2615(b)(1) claim. By contrast, the Complaint gives fair notice of a § 2615(a) claim. Compl. ¶¶ 25–26. In her brief in opposition to Location Services' summary-judgment motion, Halberg defends her FMLA claims as if she intended to pursue them under § 2615(a). Pl.'s Mem. in Opp'n at 36–40. And to its credit, Location Services does not argue that Halberg's evidently mistaken citation in her Complaint to § 2615(b)(1) should prevent her from defending her FMLA claims as having been brought under § 2615(a).

*v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims," *Bosley v. Cargill Meat Sols. Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005). The second type of claim is one for "retaliation." *Pulczinski*, 691 F.3d at 1005–06. A retaliation claim arises under § 2615(a)(2) and occurs when an employee opposes any practice made unlawful under the FMLA. *Id.* The third type of claim

> arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA. The textual basis for such a claim is not well developed in [Eighth Circuit] cases, but the claim likely arises under the rule of § 2615(a)(1) that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights defined by the FMLA. To distinguish the "entitlement" claim under § 2615(a)(1), and the "retaliation" claim under § 2615(a)(2), we think it helpful to describe this sort of complaint as a "discrimination" claim.

*Pulczinski*, 691 F.3d at 1006 (citations omitted); *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157–58 n.5 (8th Cir. 2016) (noting "unresolved difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or (a)(2)). FMLA discrimination claims are evaluated "under the *McDonnell Douglas* burden-shifting framework that is applied in Title VII cases." *Pulczinski*, 691 F.3d at 1007.

2

Halberg alleges that Location Services violated her right under the FMLA to be restored to an equivalent position following her return from leave in January 2020. Compl. ¶¶ 25–26; Pl.'s Mem. in Opp'n at 37–39. Specifically, Hallberg alleges that Location Services "failed to return [her] to an equivalent position when it assigned her completely different job duties when she returned on January 17 and terminated her on January 23." Pl.'s Mem. in Opp'n at 39. This is an entitlement claim. *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 907–08 (8th Cir. 2015) ("Brown's claim that Diversified denied her an equivalent position thus fits within the *Pulczinski* framework as a § 2615(a)(1) entitlement claim.").

"Upon return from FMLA leave, an employee is entitled to be restored to the same position held prior to the beginning of the leave, or its equivalent, in terms of benefits, pay and other terms and conditions." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)). "[T]he restoration of salary, title, and benefits does not necessarily constitute restoration to the same position within the meaning of section 2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position." *Cooper v. Olin Corp.*, 246 F.3d 1083, 1091 (8th Cir. 2001). "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R.

§ 825.215(a); *see also id.* § 825.215(e) ("An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position."). "The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job." *Id.* § 825.215(f). In the District of Minnesota, plaintiffs asserting FMLA restoration-entitlement claims have shown a genuine material-fact dispute by citing evidence showing, for example, that they were assigned "substantially less" of the available work on return from leave than they had before taking leave or that the post-leave work was "very low-level" compared to pre-leave duties, *Johnson v. Campbell Mithun*, 401 F. Supp. 2d 964, 972 (D. Minn. 2005), or that changes "eliminated a significant portion of [their] previous job duties" or required performance of duties they "had not performed in many years," *Haskell v. CentraCare Health Sys.*, 952 F. Supp. 2d 838, 842 (D. Minn. 2013).

As a matter of law, Halberg has not shown that the duties of her accounting clerk position were materially different when she returned to the position in January 2020 from before she took leave. Halberg does not dispute that the position's title, hours, salary, benefits, description, supervisor, and location were the same in January 2020 as they were in October 2019, when Halberg's FMLA leave commenced. Halberg and Location Services agree that Halberg's duties changed in one respect: for much of the one week between Halberg's return and her planned vacation, she was directed to work on Repossessors, Inc. matters though she had not previously provided services to that business line. But no reasonable juror could conclude that this assignment made Halberg's post-

leave accounting clerk position materially different from her pre-leave position. The formal description of the position contemplated this assignment. It says that Halberg could expect to be assigned "various accounting responsibilities such as importing invoices into the accounting system, help[ing] the billing team with past due reconciliations *and various tasks assigned by the accounting supervisor for support of the billing and accounting departments*." Gagne Decl. Ex. 9 (emphasis added). In other words, accounting clerks were expected (and should have anticipated that they might be asked) to provide their services where needed within the accounting and billing departments in addition to their more ordinary assignments. Halberg's deposition testimony only supports this conclusion. She agreed, for example, that "from time to time, probably on a daily basis, [she was] doing things that were additional to what may be listed in the job description[.]" Halberg Dep. at 88. Of course, it would be error in the context of an FMLA claim to understand the accounting clerk job description to authorize Halberg's supervisors to assign her billing- or accounting-department tasks that would be materially different from her usual duties— say, for example, janitorial duties or legal services. But no record evidence shows that the Repossessors, Inc. work assigned to Halberg was so removed from her pre-leave responsibilities and job skills as to produce a materially different position.

The arguments Halberg advances to support this theory of her entitlement claim are not persuasive. Halberg characterizes the law to require "strict equivalence" between the position before and after the leave. Pl.'s Mem. in Opp'n at 39. This overstates the test. It may be true that virtual identity is necessary with respect "to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites

and status." 29 C.F.R. § 825.215(a). But the law is clear that substantial similarity or equivalence is all that is required with respect to a position's day-to-day duties. *Id.*; *see also id.* § 825.215(e). In other words, the position's "essential functions" cannot be "materially different from those of the employee's pre-leave position." *Cooper*, 246 F.3d at 1091. The "strict equivalence" test Halberg advocates would set a higher bar than a test requiring "substantial similarity." Halberg argues that Haas's continuing performance of accounting clerk duties raises "a genuine fact dispute as to whether Defendant ever reinstated Plaintiff to her pre-leave role." Pl.'s Mem. in Opp'n at 39. Halberg has a point: in answering whether an employee has been restored to a not-materially-different position following return from FMLA leave, it may be relevant to consider whether other employees have retained some of the returning employee's pre-leave job duties. Here, though, it is unnecessary to look beyond the benefits and essential functions of Halberg's post-leave accounting clerk position. They show as a matter of law that the position was not materially different from her pre-leave position, and the fact that Haas retained some duties that were Halberg's before she took FMLA leave does not undermine this conclusion. Finally, Halberg says that, in her pre-leave position, "she used her skills as a trained, experienced accountant to support her department." *Id.* at 39. Halberg doesn't say explicitly that she could not use these same skills in her post-leave position. And implying that conclusion seems unwise because Halberg's description of these accounting skills is non-specific, and

14

the argument is unaccompanied by record citations showing that her post-leave duties did

not require or benefit from the use of her accountant's skill set.[6]

3

Halberg next alleges an FMLA discrimination claim based on Location Services'

termination of her employment.  To establish a prima facie FMLA discrimination claim,

Halberg must show that Location Services terminated her employment because Halberg

exercised her FMLA rights.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir.

2013).  Halberg has provided no direct evidence this occurred.  Her FMLA discrimination

claim is therefore analyzed under the burden-shifting framework described in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., City of Jacksonville*, 711 F.3d at

891; *Diversified Distrib. Sys.*, 801 F.3d at 908.  Under that framework, Halberg "must

---

[6]     In addition to her FMLA entitlement-claim theory that her post-leave position was
materially different from her pre-leave position, Halberg alleges in her Complaint, and
argues in her opposition brief, that Location Services' termination of her employment
violated her FMLA restoration right.  Compl. ¶ 26; Pl.'s Mem. in Opp'n at 39, 40; *see*
*Phillips v. Mathews*, 547 F.3d 905, 914 (8th Cir. 2008) ("The termination of an employee
for exercising rights under the FMLA could be viewed as actionable under § 2615(a)(1) as
a denial of the employee's right under 29 U.S.C. § 2614(a) to be restored to an equivalent
position upon return from FMLA leave." (Colloton, J., concurring)).  Halberg's
termination theory is not well-developed or persuasive.  Halberg was reinstated for roughly
one week prior to her termination, so this is not a case where a defendant refused
reinstatement outright or terminated an employee during a leave.  Perhaps there may be
situations where a reinstatement is so short-lived (prior to a termination) or done under
pretense that a fact-finder might reasonably conclude there was no effective or genuine
reinstatement.  What if, for example, Halberg had returned to her pre-leave position only
to be terminated one hour later?  Halberg does not argue, and cites no authority to support
the proposition, that her roughly one-week return to work was sufficiently trivial or
insignificant that a reasonable juror could determine no reinstatement actually occurred.
Nor does she argue that Location Services reinstated her knowing it soon would terminate
her employment.

15

show: (1) that [s]he engaged in activity protected under the Act, (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between [her] action and the adverse employment action." *Diversified Distrib. Sys.*, 801 F.3d at 908 (quotation omitted); *accord Pulczinski*, 691 F.3d at 1007.  To show causation, "an employee must prove that [her] exercise of FMLA rights 'played a part' in the employer's decision." *Pulczinski*, 691 F.3d at 1007 (citing *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n.3 (8th Cir. 2012) and 29 C.F.R. § 825.220(c)).  The burden of showing a prima facie case is "minimal." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quotation omitted).  If Halberg satisfies that minimal hurdle, the burden then shifts to Location Services "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802.  If Location Services meets this burden, then Halberg will have to demonstrate that Location Services' purportedly legitimate, nondiscriminatory reason was pretextual or discriminatory in its application. *Id.* at 807.  Here, there is no dispute that Halberg engaged in protected activity when she took FMLA leave from October 2019 to January 2020.  There is also no dispute that she suffered an adverse employment action when her employment was terminated.

The issue, then, is whether Halberg has identified evidence from which a reasonable juror could infer a causal connection between Halberg's FMLA leave and Location Services' decision to terminate her employment.  To meet this burden, Halberg relies on the timing of her termination in relation to her leave and opinion evidence offered by Halberg personally and other Location Services employees to the effect that there was discrimination.  This evidence is insufficient.

16

"Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citations omitted).  Temporal proximity alone may suffice only if it is "very close."  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted).  In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended."  *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted).  Without "something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and the adverse action "is too long" to show a causal connection between the two.  *Id.* at 901 (citations omitted).  Here, though the precise date seems uncertain, it is undisputed that Halberg told Location Services of her need to take FMLA leave at least before her surgery on October 23, 2019.  Her termination occurred on January 23 or 24, 2020, at least three months after Location Services knew of Halberg's planned use of leave.  That gap is too long.  At the hearing, Halberg seemed to express a fallback position that there is a sufficiently close temporal connection between what she characterizes as Principal's approval of ADA leave on January 23 and her termination on January 23 or 24.  There is a legal problem with this theory: § 2615(a) creates claims in connection with rights exercised under the FMLA, not the ADA.  There also is a factual problem: neither Principal's January 23, 2020, letter nor any other record evidence shows that Principal approved Halberg for ADA leave.

The opinion evidence Halberg identifies consists of her opinion and the opinions of "[o]ther workers" who "observed that Haas had taken over  Halberg's job duties while she was on FMLA leave and felt that [Halberg] had been terminated for taking [FMLA] leave," and Halberg's belief that other employees' terminations were discriminatory.  Pl.'s Mem. in Opp'n at 20.  Halberg testified in her deposition that "it seems like it's a running theme here" that Location Services was terminating employees "on disability."  Halberg Dep. at 71–72.  This evidence is not trial-worthy.  This is not to question Halberg's sincerity or the sincerity of other Location Services employees who may believe that Halberg (and perhaps others) were subject to adverse action for exercising FMLA rights.  The problem is that "conclusory allegations" of discrimination—as opposed to "attestations of specific facts demonstrating discriminatory conduct"—do not contribute to meeting a plaintiff's prima facie burden to show causation.  *Onyiah v. Zhao*, No. 16-cv-4111 (ECT/LIB), 2019 WL 4221347, at *3 (D. Minn. Sept. 5, 2019) (quoting *Sims v. Ford Motor Co.*, No. 1:05CV2336, 2007 WL 9753723, at *7 (N.D. Ohio Sept. 27, 2007)); *see also Woods v. Lockheed Martin Corp.*, No. 1:18-CV-3501-SDG-CCB, 2021 WL 4815903, at *10 (N.D. Ga. Aug. 24, 2021) ("Plaintiff's arguments amount to her own, unsupported beliefs that the company discriminated on the basis of race and gender—and that is not sufficient to carry the day at summary judgment."); *Oliver v. Waterbury Bd. of Educ.*, No. 3:12-CV-02185 (VLB), 2014 WL 1246711, at *18 (D. Conn. Mar. 24, 2014) (same); *Anderson v. United Parcel Serv., Inc.*, 506 F. Supp. 2d 1215, 1226 (S.D. Fla. Mar. 14, 2007) (same).

B

1

Halberg asserts two claims under the MHRA.  The first is a discrimination claim alleging that Location Services terminated her employment because of her disability.  *See* Minn. Stat. § 363A.08, subd. 2.  To prevail on this claim, Halberg must show that (1) she has a "disability" as the MHRA defines that term; (2) she was "qualified to perform the essential functions of h[er] job, with or without reasonable accommodation," and (3) she "suffered an adverse employment action because of h[er] disability." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019).

The MHRA defines a "disability" as a "condition or characteristic that renders a person a disabled person."  Minn. Stat. § 363A.03, subd. 12.  A "disabled person," in turn, is one who "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Id*.  Halberg argues that she fits the first category.

On this record, no reasonable juror could find that Halberg had an impairment that materially limited her life activities when Location Services terminated her employment. The term "'impairment' includes ongoing conditions, but does not include transient conditions in the past that no longer impair the person." *Clemons v. MRCI WorkSource*, No. A13-1994, 2014 WL 2178938, at *5 (Minn. Ct. App. May 27, 2014) (collecting cases). "The degree to which a condition limits one or more major life activities is evaluated based on the plaintiff's specific circumstances." *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 543 (Minn. 2001).  Location Services terminated Halberg's employment on

January 23 or 24, 2020. At that point, it is undisputed that Halberg had been released to work without restrictions. Gagne Decl. Ex. 7 at 26 Halberg Dep. at 72; Marciniak Dep. at 116. As far as the record shows, at least by the time she returned to work in mid-January 2020, Halberg's surgery was a success. *See Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 841 (8th Cir. 2003) (holding that summary-judgment record did not support a finding that plaintiff's cancer materially limited a major life activity because plaintiff's "cancer surgery was successful and her recuperation period was limited").

Halberg's position on this issue is not persuasive. Halberg asserts that she "could not perform manual tasks because she could not lift her arms nor [sic] hold objects[]" and that "[h]er pain and other symptoms also prevented her from sitting and exercising." Pl.'s Mem. in Opp'n at 28. These assertions are unconnected to a particular time. It is unclear, for example, whether Halberg experienced these impairments in the days immediately after her surgery or whether Halberg claims to have had these impairments at some later date. Without that basic information, it is not possible for Halberg to connect her disability to her termination. There is more. These assertions are not supported by citations to the record. *See id.* Regardless, a thorough review of the record finds no support for the conclusion that Halberg experienced these impairments around the time of her termination. Halberg also points out that her first attempted return to part-time work in November 2019 was cut short due to pain. *Id.* True enough, but (again) that fact says nothing about her condition in January 2020, and the record evidence shows Halberg at that time was able to work without restrictions. Finally, Halberg seems to argue that Principal's January 23 notice that it would review Halberg's request for leave on January 15 and 16 under the

ADA shows, or perhaps confirms, that she was impaired.  The document does not support that conclusion.  It does not show that Principal reached that determination.  It does not discuss Halberg's medical history at all.  Halberg has not identified record evidence from which a juror might reasonably conclude that she suffered an impairment in the relevant sense.[7]

2

Halberg purports to assert an MHRA reprisal claim under Minn. Stat. § 363A.15.  This claim is enigmatic.  Though the title of Count II of Halberg's Complaint refers explicitly to a claim for "Reprisal under the [MHRA]," Compl. at 5, Count II includes no legal or factual allegations to support the claim, *see id.* ¶¶ 27–35.  Count II's allegations clearly are limited to supporting Halberg's MHRA discrimination claim under § 363A.08, subd. 2.  Owing perhaps to this lack of supporting allegations, Location Services did not brief an MHRA reprisal claim.  But Halberg did.  Her opposition brief describes a theory of the claim not found in the Complaint.  After disclaiming a reprisal theory "based on a good faith, reasonable, protected report of a violation[,]" Halberg explains: "In this lawsuit,

---

[7]     Halberg asserts that Location Services "would have been worried she would need to be out again, as evidenced by the open speculation between Wallace, Marciniak, and Robideaux about her return to the role." Pl.'s Mem. in Opp'n at 29.  If this is intended to suggest that Location Services "regarded [Halberg] as having such an impairment," Minn. Stat. § 363A.03, subd. 12., it is not persuasive.  The assertion is made without citation to the record.  If it had record support, the assertion is too vague to show that Location Services "believed" that she suffered such limitations and that her impairment was "permanent or long term." *McLain v. Andersen Corp.*, 567 F.3d 956, 968 (8th Cir. 2009) (citations omitted).

21

Plaintiff alleges Defendant retaliated against her for requesting accommodation for a disability." Pl.'s Mem. in Opp'n at 34.

Summary judgment is appropriate with respect to this claim for both procedural and substantive reasons. For starters, the fact that this claim isn't in Halberg's Complaint is an independently sufficient reason to enter summary judgment. Though "the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004). That is what we have here. If that weren't so, Halberg's reprisal theory would fail on its merits. "The prima facie case for reprisal consists of: 'statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two.'" *Hoover*, 632 N.W.2d at 548 (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)). As Halberg describes this claim in her brief, if she meets the first two elements, evidence establishing the third is absent. There is no evidence from which a reasonable juror might draw a causal connection between Halberg's October 2019 request for FMLA leave and her termination. The only connection Halberg attempts to draw between these events is temporal. "But, 'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'" *Junghare v. Regents of the Univ. of Minn.*, No. A16-0456, 2016 WL 6670793, at *7 (Minn. Ct. App. Nov. 14, 2016) (quoting *Hervey v. Cnty. of Koochiching,* 527 F.3d 711, 723 (8th Cir. 2008)). If that weren't the law (and a temporal connection alone could show causation), the three-month

gap is too large to infer causation as much under the MHRA as the FMLA.  *Muafong v. Minn. Masonic Home-North Ridge Care Ctr.*, No. A06-899, 2007 WL 2034280, at *4 (Minn. Ct. App. July 17, 2007).[8]

### ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment [ECF No. 32] is **GRANTED**; and

2.  Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 4, 2022                                         s/ Eric C. Tostrud_____
                                                            Eric C. Tostrud
                                                            United States District Court

---

[8]      Halberg implies that Principal's decision to review whether she was eligible for leave under the ADA on January 15 and 16, 2020, counts as protected activity.  It does not. Halberg cites no evidence showing that she made this request.  Section 363A.15 establishes a reprisal claim when the plaintiff engages in protected activity, not a third party.